UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:19-cv-180-RJC-DSC

| | |
|---|---|
| ANTHONY GORDON MATHIS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TERRA RENEWAL SERVICES, INC., and )<br>DARLING INGREDIENTS, INC., )<br>)<br>Defendants/ )<br>Third-Party Plaintiffs, )<br>)<br>v. )<br>)<br>LJC ENVIRONMENTAL, LLC, )<br>)<br>Third-Party Defendant. )<br>_____ ) | **ORDER** |

**THIS MATTER** comes before the Court on Plaintiff's Motion for a New Trial, (DE 169), and Defendants' Motion for Entry of Judgment, (DE 177).

**I.  BACKGROUND**

**A.  Procedural History**

Plaintiff Anthony Gordon Mathis filed a Complaint in this Court against Defendants Terra Renewal Services, Inc. ("Terra") and Darling Ingredients, Inc. ("Darling") on March 10, 2019. (DE 1).[1] Defendants filed a Reply and a Third-Party Complaint against LJC Environmental, LLC ("LJC") on July 2, 2019. (DE 15).

Following discovery, the parties filed several cross-motions for summary judgment.

---

[1] The Complaint included claims for: (1) Negligence, Gross Negligence, and Willful & Wanton Conduct, (2) Breach of Warranty, (3) Piercing the Corporate Veil – Alter Ego, (4) Joint Ventures, and (5) Punitive Damages. (DE 1).

1

Included in these cross-motions, Defendants Terra and Darling filed a motion for summary judgment on Plaintiff's claim of gross negligence on March 12, 2021. (DEs 41, 42, 52, 53, 57). The motion for summary judgment on Plaintiff's claim of gross negligence was denied on June 14, 2021. (DE 64).

The parties began trial on July 12, 2021. When Plaintiff rested his case on July 15, 2021, Defendants moved for a directed verdict on multiple claims, including Plaintiff's claim of gross negligence and his defense of sudden emergency. This Court heard oral argument from all parties regarding the motion on July 15, 2021. The Court granted Defendants' motion on Plaintiff's sudden emergency defense and on Plaintiff's gross negligence cause of action. The jury found that Defendants had been negligent, but that Plaintiff had been contributorily negligent, and as a result Plaintiff did not recover. Following the verdict, Plaintiff filed a Motion for New Trial on the grounds that the Court erred by declining to present the jury with a sudden emergency instruction and by declining to present the issue of gross negligence to the jury. (DEs 169, 170). After briefing on the Motion for New Trial concluded, Defendants filed a Motion for Approval and Entry of Final Judgment, asking the Court to approve the Clerk's Judgment. (DE 177).

**B.  Factual Summary**

In the light most favorable to the non-moving party, the following facts were presented to the jury during Plaintiff's case: Plaintiff is a former truck driver who was employed by Third-Party Defendant LJC during the events in question. Defendant Terra, acting on behalf of itself and Defendant Darling, entered into the Subcontractor Services Agreement (the "Agreement") in May 2015 with LJC for the transportation of industrial residuals. (Plaintiff's Ex. 8A at 1). Under the terms of the Agreement, LJC agreed to transport industrial residuals from and to customer locations on Terra's behalf, along with additional related services, while Terra would provide

specific equipment including vacuum tanker trailers for the work. (*Id.*). The Agreement required that any equipment Terra supplied be "in good condition and in good working order," while LJC assumed responsibility for work performance safety and for ensuring that its employees observed and abided by all safety regulations and laws. (*Id.* at 3–4).

Plaintiff admits that during his work for LJC, he regularly loaded tankers in one of two ways: through the top manway hatch and through the belly port on the underside of the tanker. Plaintiff also admits he knew there was a risk of over-pressurization using the second method if the truck did not vent properly. (Trial Transr. July 15 at 163–64).

On March 10, 2017, Plaintiff—on behalf of Third-Party Defendant LJC—was to pick up and transport industrial residuals from Hunter Farms LLC in High Point, North Carolina. Defendant Terra owned the vacuum tanker trailer, Tanker 11500, that Plaintiff used for the job. (Trial Transr. July 14 at 24–25). At that time, Plaintiff had a commercial driver's license with a tanker endorsement and had driven tankers that contained pressurized loads hundreds of times. (Trial Transr. July 15 at 163–64). On March 10, 2017, Plaintiff first loaded the vacuum tanker trailer in question at a chicken plant in Wilkesboro, North Carolina, with industrial residuals through the center manway on top of the trailer. (Trial Transr. July 15 at 146–47, 149). Plaintiff then drove the tanker to a farm site to unload the trailer. (*Id.* at 151). After unloading at the farm site, Plaintiff drove to the eventual accident site at Hunter Farms, a dairy operation in High Point, North Carolina. (DE 149 at 17–19, 43–44). There, Plaintiff removed the end cap from the vent hose and began loading through the belly port on the underside of the tanker. (*Id.* at 44-46; Trial Transr. July 15 at 164–65).

As planned, sludge was pumped into the tanker through the belly port on the underside. (DE 149 at 46–48; Trial Transr. July 15 at 164–65). Plaintiff testified that normally, he would

3

check the tanker two or three times throughout the process to ensure that pressure was releasing properly. (Trial Transr. July 15 at 148–49). At some point during the loading process that day, however, Plaintiff became aware of a hissing sound, and subsequently checked the vent line to find there was no air coming out.[2] Plaintiff and Hunter Farms employee Mitch Young then determined that the tanker had become pressurized, and Young went to turn off the loading pump. (Defendants' Ex. 349A (Surveillance Video) at 14:37:20–14:37:48). Plaintiff then climbed the side of the tanker towards the manway cover and can be seen on video standing over the manway cover on top of the truck. (*Id.* 14:38:05–14:38:38). Young testified that Plaintiff indicated he was going to go up and loosen the manway lid. (Trial Transr. July 14 at 110). Not long after standing over the manway cover on top of the truck, the manway cover was blown off the pressurized tanker and Plaintiff was ejected, throwing him into the air and against a building before he landed on the ground.[3] (Defendants' Ex. 349A (Surveillance Video) at 14:38:05–14:38:38). The surveillance video is too grainy to see exactly what Plaintiff did on top of the tanker, but it clearly shows Plaintiff moving around while standing over the manway on top of the tanker. (*Id.*). Plaintiff suffered severe and permanent injuries as a result of being blown off the top of the tanker. (Plaintiff Ex. 167).

In total, forty-four seconds elapsed from when Plaintiff discovered the over-pressurization to when the manway cover was blown off, including the twenty-three seconds Plaintiff spent on top of the tanker before being ejected. (Defendants' Ex. 349A (Surveillance Video)). During the twenty-three seconds Plaintiff was on top of the tanker, at least three people walked by the tanker.

---

[2] Plaintiff's expert found no evidence that Plaintiff ever checked the vent line before he heard the hissing noise. (Trial Transr. July 14 108–09).
[3] The tanker itself did not suffer any type of catastrophic failure or rupture. (Trial Transr. July 14 at 139–40).

4

There is no evidence that Plaintiff warned any of the passerby of potential danger. At trial, Plaintiff admitted he stated in a newspaper article that standing on top of the tanker and releasing the latches on the manway lid would have been "ignorant as hell." (Trial Transr. July 15 at 162).

Reggie Porter ("Porter"), a driver for LJC, testified that he had experienced an incident in which Tanker 11500 held pressure before Plaintiff's accident. Porter could not remember the exact date of the incident but said that it occurred during warm weather. (Trial Transr. July 13 at 183–84). It is unclear from the record whether Porter was loading or unloading the tanker, but the procedure was performed at Tyson Foods in Wilkesboro. (*Id.* at 168–69). Porter climbed on top of the tanker and released the latches on the manway cover one at a time. He does not recall opening the pressure relief valve on the tanker before beginning, an action that would have prevented any pressurization if the valve was in proper order. (*Id.* at 178, 184). He testified that he heard air coming out while he opened the first manway latch, and therefore proceeded with caution when opening the next latches. (*Id.* at 168–69). When he opened the third such latch, the tanker made a loud booming noise and sludge sprayed out of the manway onto him. (*Id.*). Porter was not hurt. After this incident, Porter testified that he told James Powell ("Powell"), an employee of Defendant Terra, "that trailer is going to hurt someone because it holds pressure." (*Id.* at 170). Powell replied that the tanker would need to be "looked at" as a result of this information. (*Id.*). Porter did not tell Powell or his bosses at LJC that he had been sprayed with sludge as a result of Tanker 11500 holding pressure. (*Id.* at 182–83). Porter also testified that the latches could have been loosened while standing on the ladder rather than getting on top of the tanker. (Trial Transr. July 14 at 179–80).

Jordan Mathis, an owner of Third-Party Defendant LJC, testified that he also told Powell "there were problems" with Tanker 11500 and that "Tanker 11500 was not venting properly."

5

(Trial Transr. July 14 at 24, 27). He also testified that he has never sent one of his drivers out in a tanker that he thought was unsafe, and that he never removed tanker 11500 from service. (*Id.* at 30). Jordan further testified that at no time during LJC's relationship with Defendants did Defendants ever fail to fix a repair requested by LJC and that every sixty days Defendants would perform preventative maintenance on each tanker. (*Id.* at 28, 35–36). Jordan also testified that he did not know what was causing the pressurization issues in Tanker 11500 and that pressure buildup can occur due to driver error. (*Id.* at 31, 51–52). In regard to Plaintiff Anthony Mathis, Jordan Mathis's employee, Jordan said Plaintiff was disgruntled, not happy to be at work, frequently late, and tended to rush. (*Id.* at 29).

Luke Mathis, also an owner of Third-Party Defendant LJC, testified that tankers have an inherent risk of pressurization. According to Luke Mathis, over-pressurization can occur based on either driver error or by a malfunctioning tanker. (Trial Transr. July 14 at 185–87). Luke Mathis also testified that Defendants and LJC held multiple meetings between January 2016 and February 2017 during which LJC informed Defendants of tanker pressurization issues, among other issues. (Trial Transr. July 15 at 43–44). He further testified that LJC used each tanker approximately six days a week, and that Tanker 11500 was used successfully hundreds of times before the accident. (*Id.* at 8). Luke Mathis testified further that he has never allowed a driver to pull a tanker he thought was unsafe. (Trial Transr. July 14 at 172–73). Finally, Luke Mathis testified that, while the pressurization of the tanker on March 10, 2017, was a potential emergency, Plaintiff had ample time after he discovered the pressurization to decide how to deal with the situation. (Trial Transr. July 15 at 60, 72–73). He testified that, if Plaintiff had just waited and done nothing, the pressure in the tanker would have gone down by itself. (*Id.* at 14).

6

Defendant's Exhibit 46A shows that tanker 11500 was inspected and preventative maintenance was performed on February 14, 2017, after the over-pressurization incident with Porter occurred and less than thirty days before Plaintiff's accident. (Defense Ex. 46A; Trial Transr. July 15 at 47; Trial Trans. July 16 at 61, 97). Exhibit 46A also shows that the tanker was washed out on November 28, 2016. (Defense Ex. 46A; Trial Trans. July 16 at 61–62).

## II. STANDARD OF REVIEW

A motion for directed verdict shall be granted if there is not "sufficient evidence to support a verdict for the party opposing the motion." *Tights, Inc. v. Acme-McCrary Corp.*, 541 F.2d 1047, 1055 (4th Cir. 1976). The test for a directed verdict is whether, "without weighing the evidence or considering the credibility of the witnesses, there can be but one conclusion as to the verdict that reasonable jurors could have reached." *Gairola v. Com. of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) (quoting *Wheatley v. Gladden,* 660 F.2d 1024, 1027 (4th Cir.1981)) (internal citations omitted). "As a consequence, the case should be withdrawn from the jury when any verdict in favor of the nonmoving party necessarily will be premised upon 'speculation and conjecture.'" *Gairola v. Com. of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) (quoting *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir.), *cert. denied*, 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229 (1958)). "In considering a motion for a directed verdict, the court must construe the evidence in the light most favorable to the party against whom the motion is made." *Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772, 776 (4th Cir. 1990).

The standard for a motion for a new trial is explained in *Raynor v. G4S Secure Sols. (USA) Inc.*, 327 F. Supp. 3d 925, 933 (W.D.N.C. 2018), *aff'd*, 805 F. App'x 170 (4th Cir. 2020):

> Rule 59(a) provides that courts may grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Under this standard, "[a] new trial will be granted if '(1) the verdict is against the clear weight of the evidence, or (2) is

7

based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'" *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (citation omitted).

"A district court's denial of a motion for a new trial is reviewed for abuse of discretion, and will not be reversed save in the most exceptional circumstances." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014) (quotation marks omitted).

## III. DISCUSSION

### A. Motion for a New Trial

As explained below, Plaintiff fails to show how the Court erred in granting the directed verdict on the issues of gross negligence and the sudden emergency doctrine. Nor does Plaintiff show how the directed verdict is against the clear weight of the evidence, based upon false evidence, or will result in a miscarriage of justice. Therefore, Plaintiff is not entitled to a new trial.

#### i. Gross Negligence

Plaintiff argues that the Court erred by granting Defendants' Rule 50(a) Motion on Plaintiff's Gross Negligence Cause of Action because Plaintiff offered substantial and sufficient evidence to establish a prima facie case of gross negligence when viewed in a light most favorable to the Plaintiff. (DE 170 at 20). The North Carolina Supreme Court has defined gross negligence as "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Yancey v. Lea*, 354 N.C. 48, 52 (2001) (quoting *Bullins v. Schmidt*, 369 S.E.2d 601, 603 (N.C. 1988)). "Gross negligence requires a finding that the conduct is willful, wanton, or done with reckless indifference." *Sawyer v. Food Lion, Inc.*, 144 N.C. App. 398, 403 (2001) (quoting *Yancey v. Lea,* 139 N.C. App. 76, 79 (2000)). "Willful conduct is done with a deliberate purpose." *Id.* "Conduct is wanton when it is carried out with a wicked purpose or with reckless

8

indifference." *Id.* "Thus, gross negligence encompasses conduct which lies somewhere between ordinary negligence and intentional conduct." *Sawyer*, 144 N.C. App. at 403.

Plaintiff presented evidence that, prior to the accident, Defendant Terra was told Tanker 11500 could hold pressure and that one employee believed the tanker could "hurt someone." Plaintiff also presented evidence that LJC generally discussed pressure issues related to the tankers (although not Tanker 11500 in particular) with Defendants prior to the accident. However, even in the light most favorable to the Plaintiff, this evidence does not provide a reasonable jury with a basis upon which to find in Plaintiff's favor on the issue of gross negligence.

First, Plaintiff only presented evidence that Defendants were aware of a driver's belief that the tanker could "hold pressure," and that the driver believed it was dangerous, rather than being aware of the underlying facts of the incident in question. The evidence at trial did not show that Defendants had any knowledge that Tanker 11500 had become pressurized and spewed sludge onto Porter when he attempted to open it. Instead, they were aware only of one driver's opinion on the tanker, which might have been based on either tanker malfunction or driver error, and they subjected the tanker to regular inspection and preventative maintenance, including less than thirty days before the accident, which returned no red flags. In light of this, Defendants did not demonstrate a deliberate purpose or a reckless indifference.

Moreover, even though management at LJC knew that tanker 11500 may have had venting problems, at no time did LJC ask for tanker 11500 to be removed from service. And Jordan and Luke Mathis, owners of LJC, testified that they would never allow a driver to operate a tanker they thought was dangerous, and that Terra always performed requested repairs on the tankers. This disproves any notions of willful or reckless indifference as the owners of LJC did not think that tanker 11500 was dangerous, let alone Defendants.

Second, even if Defendants had known about the incident in which Porter was sprayed with sludge, the evidence still would not be sufficient to raise Defendant's conduct to the level of gross negligence. The incident in question was substantially different from the accident that caused Plaintiff's injuries. Porter's incident took place while either unloading or loading from the top middle manway at Tyson Foods, rather than from the bottom port while at Hunter Farms, meaning that the loading system in use was entirely different. As far as Defendants knew, there was also a chance that Porter forgot to open the pressure release valve, which would indeed have caused a buildup of pressure. Finally, the tanker was empty when Porter was sprayed while the tanker was partially full when Plaintiff's accident occurred. These differences between the incidents are substantial and mean that Porter's incident was not a clear forecast of the accident that eventually occurred to Plaintiff. Thus, even if the Defendants had known about Porter's incident, this knowledge would not have created the level of willful, wanton, or reckless indifference required to be grossly negligent with regard to the injury that ultimately befell Plaintiff.

Finally, uncontroverted evidence was presented during Plaintiff's case that Tanker 11500 was inspected and used successfully hundreds of times between the Porter incident and Plaintiff's accident. While Porter could not remember the exact date of his incident, his testimony that it occurred during warm weather before the March 2017 accident meant that, at the latest, the incident occurred in early fall of 2016. Based on the testimony about tanker usage, Tanker 11500 would have been used successfully over two hundred times between Porter's incident and the Plaintiff's accident. These facts make the case at hand distinguishable from the cases that Plaintiff cites in support of his motion for a new trial.[4] Unlike in these cases, Defendants here did not

---

[4] *See Estate of Long v. Fowler*, 270 N.C. App. 241 (2020) (finding that Defendants ignored proper winterization procedures for a chiller, did not use the chiller after the procedures were done incorrectly, and did not warn Plaintiff); *Beck v. Carolina Power & Light Co.*, 57 N.C. App.

10

consciously create a dangerous situation and then ignore it and had successfully used the tanker hundreds of times after the potential warning without incident. Even if Porter's incident had sufficiently alerted Defendants of the specific danger required of gross negligence, the tanker's subsequent repeated successful use and cleared inspections would have negated such a red flag for gross negligence purposes.

Given the facts that Tanker 11500 had been used for months without issue after Porter's incident, that Defendants were not aware of the incident details, that the tanker was inspected between Porter's incident and Plaintiff's accident, that the tanker was not pressurized by the same loading process between the two incidents, that LJC did not think tanker 11500 was dangerous, and that there was a reasonable chance Porter's pressurization issues were caused by driver error, there is not sufficient evidence that Defendants were acting wantonly or with reckless indifference by not taking Tanker 11500 out of service prior to Plaintiff's accident. *See Sawyer v. Food Lion, Inc.*, 144 N.C. App. 398, 403 (2001) (finding that Defendant's failure to cover holes in the floor during Plaintiff's ceiling installation work was not willful or wanton because such failure was "neither deliberate nor wicked in its purpose").

Viewed in the light most favorable to Plaintiff, there is not sufficient evidence from which a reasonable jury could conclude that Defendants were guilty of gross negligence. Therefore, this issue does not create grounds for a new trial.

    ii.    <u>Sudden Emergency</u>

Plaintiff also argues that the Court erred by granting Defendants' Rule 50(a) Motion on Plaintiff's sudden emergency defense because Plaintiff offered substantial and sufficient evidence

---

373 (1982) (finding that the transformer had been installed in a manner that violated national electric safety code and that the transformer had not been inspected in four years); *Cole v. Duke Power Co.*, 81 N.C. App. 213 (1986) (finding that uninsulated wires were in an unlocked cabinet violating national electric safety code and that the inspection done was blatantly incorrect).

to establish a prima facie case of sudden emergency when viewed in the light most favorable to the Plaintiff. (DE 170 at 13). The North Carolina Supreme Court outlined the sudden emergency doctrine, stating:

> When a person exercises the care and caution in an emergency which he did not cause or bring about in whole or material part, and which was caused by the negligence of another, which an ordinarily prudent person would have used under the same or similar circumstances, he is not negligent merely because he fails to exercise the best judgment, or does not take the safest course, or does not take every precaution which from a careful review of the circumstances it appears he might have taken, or, in attempting to escape the danger under such circumstances, puts himself in a more dangerous position.

*Rodgers v. Thompson*, 123 S.E.2d 785, 790 (N.C. 1962) (quoting 65 C.J.S. Negligence s 123, pp. 734–35) (internal citations and brackets omitted).

"To receive a jury instruction on sudden emergency, plaintiff must present substantial evidence showing, first, she perceived an emergency situation and reacted to it, and second, the emergency was not created by plaintiff's negligence." *Carrington v. Emory*, 635 S.E.2d 532, 534 (N.C. Ct. App. 2006). "An emergency situation has been defined as that which compels a party to 'act instantly to avoid a collision or injury.'" *Id.* (quoting *Holbrook v. Henley*, 118 N.C. App. 151, 154 (1995)). A sudden emergency is one that is unforeseen and, because of this quality, causes surprise and terror. *Horton Motor Lines v. Currie*, 92 F.2d 164, 168 (4th Cir. 1937).

Plaintiff argues that there was a sudden emergency when Plaintiff realized that the tanker had become over-pressurized, and that Plaintiff had to act immediately in response to the emergency. Plaintiff points to evidence elicited in trial that over-pressurization is dangerous, as well as to Luke Mathis' statement that Plaintiff was dealing with a potential emergency. However, there was uncontroverted evidence presented at trial that an emergency situation did not exist. First, Luke Mathis testified that, after Plaintiff realized the tanker was pressurized, the pressure would have gone down by itself if Plaintiff had simply waited; the very fact that hissing could be

12

Case 3:19-cv-00180-RJC-DSC     Document 181     Filed 11/10/21     Page 12 of 16

heard meant that the tanker was depressurizing. Although Luke Mathis also testified that the situation was a potential emergency, for the purposes of the sudden emergency doctrine, it does not qualify because Plaintiff was not required to immediately deal with the situation as there was no danger of imminent disaster. Sufficient evidence was presented during Plaintiff's case that Plaintiff should have known there was no emergency. Moreover, during the twenty-three seconds Plaintiff stood on top of the tanker before the manway cover blew off, there was no evidence presented that Plaintiff took any action to alert bystanders of the dangerous situation, even though at least three people walked nearby the tanker during this time. This tends to negate Plaintiff's argument that there was an emergency or that Plaintiff perceived an emergency situation whereby the entire tanker could explode.

Furthermore, forty-four seconds elapsed between Plaintiff discovering the over-pressurization and the manhole cover exploding from the tanker. These facts make the case at hand very different from the typical case in which the sudden emergency doctrine is applied. Ordinarily, the doctrine is invoked when Plaintiff only has a matter of seconds at most to react to an unexpected emergency. *City of High Point, N. Carolina v. Suez Treatment Sols. Inc.*, 485 F. Supp. 3d 608, n. 3 (M.D.N.C. 2020) (noting that the sudden emergency doctrine is usually applied in automobile cases and that an "emergency situation has been defined as that which compels a party to act instantly to avoid a collision or injury"). Here, the evidence presented at trial showed that Plaintiff did not have to react instantaneously and had substantially more time to decide how to react than mere seconds.

This case is also distinguishable from the cases that Plaintiff raised in his motion for a new trial. Plaintiff cites *Moore v. Beard-Laney, Inc.*, 263 N.C. 601 (1965) and *Rodgers v. Thompson*, 256 N.C. 265 (1962) as analogous cases. Both involve tankers carrying gasoline, a highly

13

flammable substance that presents a higher risk to drivers than the sludge contained in Tanker 11500. In *Moore*, gasoline was already spilling out of the tanker truck, presenting an immediate risk of explosion. *Moore*, 263 N.C. at 607–08. In *Rodgers*, the tanker truck was already on fire because of an automobile accident and similarly presented an immediate risk of explosion. *Rodgers*, 256 N.C. at 273. Conversely, in the case at hand, the evidence presented at trial showed that the pump had been shut off and the pressure was slowly releasing from the tanker. The situation did not require the same sort of instantaneous action that was required in both *Moore* and *Rodgers*.

Finally, the evidence presented at trial showed that the situation should not have caused Plaintiff to act with the surprise and terror required of the sudden emergency doctrine. Plaintiff testified that he had a tanker endorsement and had driven hundreds of loads with pressure, and that he took steps to ensure the tankers he drove did not become pressurized, all of which indicates that Plaintiff was aware of the inherent risk of pressurization. Because of this awareness, the increase in pressure was not an unforeseeable outcome, and was instead a possibility that, according to his testimony, he would have been monitoring. Because of this knowledge, "[he] should [have acted] with the care of a man trained to meet just such situations, not with the terror-stricken precipitancy of one who is suddenly confronted with an unforeseen peril." *Horton Motor Lines v. Currie*, 92 F.2d 164, 168 (4th Cir. 1937).

Therefore, for the reasons stated above and viewed in the light most favorable to Plaintiff, Plaintiff did not present substantial evidence that an emergency situation existed.

### B. Motion for Entry of Judgment

Defendant asks this Court, out of an abundance of caution, to approve the final judgment entered by the Clerk should the jury verdict be deemed a special verdict or a general verdict with

14

answers to written questions. (DE 178 at 1; DE 180 at 1). However, both parties agree the jury verdict was a general verdict that does not require the Court's approval.

The Clerk does not need the Court's approval to enter a final judgment when the jury returns a general verdict. Fed. R. Civ. P. 58(b)(1)(A). But, when the verdict is a special verdict or a general verdict with answers to written questions, the Court must approve the verdict before the judgment is final. Fed. R. Civ. P. 58(b)(2)(A). A special verdict requires a "special written finding on each issue of fact" that usually requires a "brief answer." Fed. R. Civ. P. 49(a). A general verdict with answers to written questions requires both legal answers and "written questions on one or more issues of fact." Fed. R. Civ. P. 49(b). Unlike a general verdict, where the jury simply answers a legal question, both a special verdict and general verdict with answers to written questions require the jury to decide issues of fact. These types of verdicts thus require Court approval to ensure there are no inconsistencies. *Legacy Data Access, LLC v. Mediquant, Inc.*, No. 3:15-cv-00584-FDW-DSC, 2017 U.S. Dist. LEXIS 198817, at *38 (W.D.N.C. 2017) (citing *Figg v. Schroeder*, 312 F.3d 625, 642 (4th Cir. 2002)).

Here, the jury answered two simple questions: (1) whether Plaintiff was injured by Defendant's negligence and (2) whether Plaintiff's own negligence contributed to his injuries. The jury answered "yes" to both questions. (DE 164). These are both answers to legal questions and do not involve written explanations regarding any factual issues. This makes the verdict a general verdict that is final once entered by the Clerk, without the need for Court approval. As such, the Clerk's judgment from July 27, 2021, is final and the Court does not need to approve. All post-trial deadlines thus run from that date. (DE 165).

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

15

1. Plaintiff's Motion for a New Trial, (DE 169), is **DENIED**.

2. Defendant's Motion for Approval and Entry of Final Judgment, (DE 177), is **DENIED**. The Clerk's judgment, (DE 165), is a final judgment.

**SO ORDERED.**

Signed: November 10, 2021

Robert J. Conrad, Jr.
United States District Judge